**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

ANDERSON CONTRERAS HERNANDEZ,

*Petitioner-Plaintiff,*

v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security; ROSE BROPHY, in her official capacity as Director of Field Operations, Buffalo Field Office, U.S. Customs and Border Protection; MARTIN COOMBS, in his official capacity as Patrol Agent in Charge, Buffalo Station, U.S. Border Patrol; STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement.

*Respondents-Defendants.*

Civil Action No.:

**Corrected VERIFIED Petition for Writ of Habeas Corpus and Complaint for Injunctive Relief**

*Oral Argument Requested*

---

<u>**INTRODUCTION**</u>

1.  This case is about Anderson Contreras Hernandez ("Petitioner-Plaintiff" or "Anderson"), a 20-year-old young man from Venezuela who is receiving life-saving treatment at Oishei Children's Hospital ("Oishei") in Buffalo, NY, while detained by U.S. Customs and Border Protection ("CBP") custody. Anderson is being detained without access to counsel, at Oishei for "acute vaso-occlusive pain crisis with acute pain in his spleen," Ex. 1, Letter from Dr.

1

Ambrusko dated June 10, 2025, a complication of sickle-cell disease which causes life-threatening complications.

2. Anderson was diagnosed with Hereditary Hemolytic Anemia (Hemoglobinopathy SC), a type of Sickle Cell Disease,[1] at age 6.  *See* Ex. 2 Letter of Doctor Montes. According to Anderson's current doctor, Steven J. Ambrusko, MD, MS, placement in any detention center would put Anderson in "direct risk of harm or death" due to conditions and the inability to provide prompt medical care.  Ex. 3, Letter of Dr. Ambrusko dated June 10, 2025.

3. Through this petition and complaint, Anderson does not seek to challenge the government's removal proceedings against him. Instead, he claims that his arrest and detention are in violation of CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS"), the Administrative Procedure Act ("APA"), Section 504 of the Rehabilitation Act ("Section 504"), his First Amendment Right to Access to Counsel, the Fourth Amendment, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

4. To remedy this alleged violation, Anderson respectfully requests this Court to order the Respondent-Defendants to permit Anderson access to counsel, release Anderson from their custody, and enjoin his transfer to Immigration and Customs Enforcement Custody.

## PARTIES

5. Anderson is a native and citizen of Venezuela. He is currently receiving treatment at Oishei Children's Hospital due to an acute illness caused by his Sickle Cell Disease and is in the custody of CBP and USBP.

6. Respondent-Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). She is sued in her official capacity only. Secretary Mayorkas is charged with the

---

[1] *Sickle cell disease*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/12100-sickle-cell-disease, accessed June 14, 2025.

operations of DHS, including detention and removal actions taken by DHS's sub-agency, USBP.

7. Respondent-Defendant Rose Brophy is the Director of Field Operations for the Buffalo Field Office of U.S. Customs and Border Protection (CBP). Director Brophy is charged with the operation of CPB, including USBP, which is a sub-office of CBP. She is sued in her official capacity.

8. Respondent-Defendant Martin Coombs, is the Patrol Agent in Charge ("PAC") for the Buffalo Station of USBP. He is sued in his official capacity.

9. Respondent-Defendant Stephen Kurzdorfer is sued in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement.

10. Respondent-Defendant Joseph Freden is sued in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility.

11. Respondent-Defendant Todd Lyons is sued in his official capacity as Acting Director U.S. Immigration and Customs Enforcement.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

13. The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All Writs Act); 28 U.S.C. § 2241 (habeas corpus); and 5 U.S.C. § 701 (the Administrative Procedure Act).

14. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), to grant injunctive and declaratory relief.

15. Venue is proper in the U.S. District Court for the Western District of New York because Respondents-Defendants are officers of United States agencies, Anderson currently resides within this District, and there is no real property involved in this action. *See* 28 U.S.C. § 1391(e)(1).

16. Administrative exhaustion is unnecessary because it would be futile.

## RELEVANT FACTS AND PROCEDURAL HISTORY

17. Anderson was born in 2005, in Venezuela. He was diagnosed at age six with Sickle Cell Disease. *See* Ex. 2. Letter of Dr. Montes.

18. Anderson presented himself to border officials in Brownsville, Texas on or about January 31, 2024 and requested the opportunity to seek asylum. *See* Ex. 4, Notice to Appear. Anderson was released from the border on humanitarian parole, *see* Ex. 5, 1-94 (showing DT class of admission); Ex. 6, CBP guidance on DT (parole) status, and given a court date of April 17, 2024. Ex. 4, Notice to Appear.  On that day, April 17, 2024, Anderson filed his Form I-589 Application for Asylum and for Withholding of Removal, based on his fear of return to Venezuela.

19. After living in New York City for three months, Anderson moved to Buffalo, New York where he continues to reside. Currently, he is scheduled for another Master Court Hearing on August 15, 2025 in New York, New York. *See* Ex. 7, EOIR Court Information.

20. On June 6, 2025, while shopping for a new outfit for his birthday, Anderson was accused of shoplifting and arrested by Cheektowaga Police Department. Upon information and belief Anderson was given an appearance ticket. CBP thereafter took Anderson into custody.

21. Also on June 6, 2025, Anderson was brought to the Buffalo Border Patrol Station located at 600 Colvin Woods Pkwy, Tonawanda, NY 14150, for processing by USBP. Anderson Hernandez went into a Sickle Cell Crisis and was brought to Oishei Children's Hospital in Buffalo, NY. He was promptly admitted to the hospital for another vaso-occlusive pain crisis and spleen enlargement. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025.

22. Since his diagnosis of Sickle Cell Disease at the age of six, Anderson has received forty-seven blood transfusions, has had several occasions of acute chest syndrome (a severe complication involving pneumonia leading to red blood cells sickling into the lungs), and had a surgical resection of his lung. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025. He has also experienced many episodes of splenic sequestration during which his spleen grows in size and pools blood, similar to internal bleeding. *Id.* As noted by Dr. Ambrusko, these episodes can be fatal if not treated immediately. *Id.* Finally, Anderson also often suffers from vaso-occlusive pain crises that can result in severe pain episodes requiring aggressive pain control such as the use of oral narcotics or intravenous morphine. *Id.*

23. While living in Buffalo, NY, Anderson has received treatment from the Hematology Department at Oishei Children's Hospital and Roswell Park Comprehensive Cancer Center. *Id.* His medical provider has noted that his disease is even more severe than usually expected for his age and for his type of sickle cell disease. *Id.*

24. CBP will not be able to provide sufficient medical care for Anderson should he be transferred from the hospital to a CBP holding center. CBP holding centers are meant for short-term custody, usually 72 hours or less. While some facilities are able to contract with medical

providers, it seems that not all of them have this provision in place and end up relying upon local, external, medical facilities when a detainee is medically high-risk.[2]

25. The CBP holding facility in Tonawanda, NY is especially unable to provide appropriate care for Anderson because they have more non-citizens than usual, are holding non-citizens for longer periods of time, and are ill-equipped for basic provisions like food preparation and showers.[3]

26. Anderson, in addition to medical care and narcotic or intravenous pain medication, requires preventative care in the form of temperature, nutrition, and hydration controls. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025. Without those conditions acting as preventive measures, Anderson is increasingly likely to have another acute crisis. *Id.* Should Anderson receive trauma to his abdomen, his spleen could rupture, a situation that could be fatal within minutes. *Id.* Furthermore, soon he will be in need of surgery to remove his spleen. *Id.* This will require visits for preoperative assessments, the surgery itself, as well as postoperative care. *Id.* Of note, correction facilities, which often bear very similar, if not exact, infrastructure to immigration detention centers, are considered "high-risk" congregate settings for infectious diseases, a concern for anyone preparing for or recovering from surgery.[4]

---

[2] U.S. Department of Homeland Security, U.S. Customs and Border Protection, Office of the Chief Medical Officer. CBP Directive No. 2210-004 *Enhanced Medical Support Efforts,* Date: May 21, 2024, Accessed June 13, 2025. https://www.cbp.gov/sites/default/files/2025-02/supplemental_guidance_to_enhanced_medical_directive.pdf.

[3] Investigative Post, Shoemaker. "Feds adding Migrant Detention Centers in Buffalo Area." June 13, 2025. Accessed on June 13, 2025. https://www.investigativepost.org/2025/06/13/feds-adding-migrant-detention-centers-in-buffalo-area/.

[4] Kendig, Newton E et al. "Infection Prevention and Control in Correctional Settings." *Emerging infectious diseases* vol. 30,13 (2024): S88-S93. doi:10.3201/eid3013.230705.

27. Per Anderson's medical provider, Dr. Ambrusko, placement in any detention center would put Anderson in "direct risk of harm or death" due to conditions and the inability to provide prompt medical care. *See* Ex. 1, Letter from Dr. Ambrusko and Dr. Carlberg dated June 10, 2025.

28. Upon information and belief, it is Petitioner and counsel's understanding that Defendant-Respondents intend to transfer Anderson to Immigration and Customs Enforcement ("ICE") custody and detain him in a federal immigration detention facility.

29. Since Anderson was taken into custody on June 6, 2025, he has been denied access to counsel on several occasions. Upon information and belief, officers from either CBP or USBP have been posted outside of Anderson's hospital room since his arrival at Oishei on June 7, 2025.

30. Anderson is represented by PLS attorney Catherine Grainge. Attorney Grainge went to Oishei Children's Hospital around 4 P.M. for a legal meeting with Anderson. During the meeting, an officers asked to speak with Attorney Grainge and informed her she would not be permitted to meet with Anderson. Ex. 8, Dec. of Attorney Grainge.

31. When Attorney Grainge asked what policy the officer was relying on to prevent her from meeting with her client, the Officer said it was on his own authority. Attorney Grainge left the hospital room. *Id.*

32. On June 9, 2025 around 7 P.M. Attorney Grainge returned to Oishei to meet with Anderson for a legal visit and was permitted to enter the hospital room and meet with Anderson. *Id.*

33. On June 12, 2025 around 8 A.M. Ms. Grainge went to Oishei Hospital to meet with Anderson for a legal visit. She was informed by an Officer named "Dan" that he was told Anderson was not permitted any visitors and that he would need to check with a supervisor about whether Attorney Grainge could meet with Anderson. *Id.*

34. The Officer reached out to his supervisor, Officer Adam Matuszewski, who in turn, reached out to his supervisor, PAC Martin Coombs, named Respondent-Defendant in this case. Attorney Grainge was given the number for PAC Coombs and called him. PAC Coombs informed her that she would not be permitted to meet with Anderson. *Id.*

35. Attorney Grainge informed PAC Coombs that she believed this was a violation of Anderson's right to access to counsel. PAC Coombs then informed Attorney Grainge he would call her back. PAC Coombs called Attorney Grainge back a few minutes later and confirmed she would not be permitted to visit Anderson. *Id.*

36. On June 13, 2025 around 3 P.M. Attorney Grainge called Oishei Hospital to speak with Anderson. She was transferred to Anderson's social worker at the hospital who informed Attorney Grainge that due to unclear and inconsistent guidance from CBP she did not feel comfortable providing Anderson with a phone to speak with Attorney Grainge. *Id.*

37. Dr. Ambrusko states that Anderson "currently has further painful enlargement of his spleen, putting him at risk for rupture of the spleen, splenic sequestration, and/or splenic infarction – all of which can be fatal if untreated." Letter of Dr. Ambrusko dated June 8, 2025. Anderson requires narcotic pain medication and is currently on IV morphine as needed. *Id.* He is unable to take other pain medications as "he has a severe allergy to NSAIDs" and other drugs like acetaminophen are "largely ineffective" for this condition. *Id.*

38. Dr. Ambrusko recommends Anderson consult with a surgeon to discuss removal of his spleen as a result of this most recent acute episode. This will require preoperative transfusion of red blood cells and further hospitalization. *Id.*

39. Anderson will not have access to the life-sustaining care he requires if returned to a CBP facility or in the event he is transferred to ICE custody. Per Dr. Ambrusko, "sickle cell disease

complications are unpredictable and can become severe very quickly, within hours to minutes. Exposure to extremes in temperature (as is more likely in prison/jail setting) is a frequent trigger for sickle cell disease complications to occur, especially painful vaso-occlusive crises that will be made worse if he cannot receive oral narcotic medication promptly or get access to emergency care for immediate IV narcotic treatment. Since he already has an enlarged spleen, any trauma to his abdomen (as could easily happen in custody) and/or acute abdominal pain warrants immediate evaluation as it could represent splenic rupture, fatal if not emergently diagnosed and managed with prompt transfusion." Ex. 3, Letter of Dr. Ambrusko dated June 8, 2025.

40. Further, placement in detention will put Anderson at increased risk of complications and he will not have access to the preventive care he requires to maintain his health and avoid life-threatening complications from his Sickle Cell Disease. These include "regular outpatient care, and adequate preventative care at home including good nutrition & hydration, secure housing with temperature control, and resources to avoid certain triggers that can induce sickle cell crises." *Id.*

41. The severity of Anderson's Sickle Cell Disease and the quick onset of potentially fatal complications puts Anderson at risk of severe bodily harm or death if he is placed in a detained setting. These complications will also limit his ability to participate fully in his removal proceedings.

## **LEGAL FRAMEWORK**

### **CBP'S National Standards on Transport, Escort, Detention, and Search**

42. The National Standards on Transport, Escort, Detention, and Search 2015 (TEDS)[5] outlines

    the rules and regulations that guide CBP actions as they relate to CBP's interactions with

    detained individuals.

43. "The new policy document is grounded firmly in the experience and policies of the Office of

    Field Operations and the United States Border Patrol. It incorporates best practices developed

    in the field, and it reflects key legal and regulatory requirements. In addition to transport,

    escort, detention and search provisions, TEDS also includes requirements related to: sexual

    abuse and assault prevention and response; care of at-risk individuals in custody; and

    personal property." TEDS, Foreword from the Commissioner, p. 3.

44. The TEDS defines "at-risk populations/at-risk Detainees" as Individuals in the custody of

    CBP who may require additional care or oversight, who may include: . . . those known to be

    on life-sustaining or life-saving medical treatment; . . . those who have identified mental,

    physical or developmental disabilities." TEDS, Section 8.0, Definitions, p 28.

45. Section 3.11 on Medical Treatment and Authority at a Medical Facility states that "Once a

    detainee is at a medical facility, medical practitioners make all medical decisions which may

    include medical release or fitness for travel. Officers/Agents have no authority over the

    detainee's medical treatment, but remain responsible for enforcement decisions regarding the

    detainee."

46. Section 4.1 on Duration of Detention states that "Detainees should generally not be held for

    longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to

---

[5] Available at: https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search

hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

47. The TEDS require CBP officers to "determine if the detainee may be considered an at-risk detainee" "[b]efore placing any detainees together in a hold room or holding facility."

48. The TEDS also require that "Detainees referred for removal proceedings shall be provided with a list of legal service providers and their contact information." TEDS, Section 4.8 Consular Contact and List of Legal Service Providers, p. 16.

49. The TEDS further provide that "Officers/Agents must grant detainees telephone access per the operational office's policies and procedures and may, at their discretion, grant telephone access to any detainee even if not required."

50. TEDS policy for hospitalized detainees states: "If the detainee is hospitalized, officers/agents will follow their operational office's policies and procedures, and document the hospitalization in the appropriate electronic system(s) of record.  At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation." TEDS 4.10, Medical, Hospitalization, p 17.

51. The TEDS policy for at-risk populations states that "CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability" and that "[r]easonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations."

52. Further, the TEDS policy for at-risk detainees states that "[e]xtra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms." TEDS, Section 5.1 General, p. 19.

53. The TEDS Detention standards requires "expeditious processing" and placement n the "least restrictive setting appropriate to their age and special needs, provided that the such setting is consistent with the need to ensure the safety and security of the detainees and that of others." TEDS, Section 5.6, p. 22.

54. The TEDS prohibit release of an at-risk detainee "to any person or entity that officers/agents have reason to believe may harm or neglect the at-risk detainee." TEDS, section 5.1, p 19.

## CAUSES OF ACTION

### FIRST CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Substantive Due Process); 5 U.S.C. §§ 702, 706**

55. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

56. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691.

57. Petitioner-Plaintiff is not a flight risk nor is he a danger to the community. Respondents' detention of Anderson is therefore unjustified and unlawful. Accordingly, Petitioner-Plaintiff is being detained in violation of his Constitutional right to Due Process under the Fifth Amendment.

## SECOND CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Substantive Due Process—State created danger); 5 U.S.C. §§ 702, 706**

58. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

59. Petitioner-Plaintiff alleges that Respondent-Defendants actions in detaining him in light of his serious and life-threatening medical needs, violates his substantive due process rights.

60. When government actors are deliberately indifferent to the medical needs of individuals in conduct is egregious enough to constitute a violation of the individual's right to substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998).

61. Substantive due process also precludes a state actor from affirmatively acting to create or enhance a danger that will ultimately harm an individual. *See Butera v. D.C.*, 235 F.3d 637, 649–51 (D.C. Cir. 2001) (citing cases). The State "owes a duty of protection when its agents create or increase the danger to an individual." *Id.*; *see also Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (due process was violated where police officers left detainee in a more dangerous neighborhood, away from public transportation and without a cell phone); *Wang v. Reno*, 81 F.3d 808, 817 (9th Cir. 1996) (noncitizen could not be removed to China where U.S. government convinced him to testify about topic that would lead Chinese government to torture and possibly execute him). Due process is implicated when the state actor's conduct in such a case is "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Butera*, 235 F.3d at 651 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

62. Respondents-Defendants are on notice that Anderson's life will be in danger if he is placed in a detention setting, and that he requires additional surgeries to address his current medical

needs. *See* Ex. 3 Letter of Dr. Ambrusko dated June 8, 2025; Ex. 1 Letter of Dr. Ambrusko dated June 10, 2025.

63. Respondents-Defendants' actions in arresting, detaining, and continuing to detain Petitioner-Plaintiff in light of his serious and life-threatening medical needs is egregious and shocks the conscience.

**THIRD CLAIM**

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Procedural Due Process); 5 U.S.C. §§ 702, 706**

64. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

65. The Fifth Amendment of the United States Constitution guarantees that noncitizens receive adequate procedural protections in the course of any executions of the government's detention and removal authorities. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Such protections are flexible and guided by considerations for the "private interest that will be affected[,]" "the risk of an erroneous deprivation of such interest through the procedures used[,]" and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

66. The government made the reasoned decision to release Anderson from detention while he pursued his asylum claim in the United States. The Due Process Clause entitles Anderson to meaningful process assessing whether his detention is justified. The arrest and detention of Anderson without an opportunity for Anderson to contest his detention in front of a neutral decisionmaker after he had been living and working and participating in his immigration

14

removal proceedings in the United States for over sixteen months provide insufficient process and violates the Due Process Clause of the Fifth Amendment of the Constitution.

67. As a result of this ongoing violation, Petitioner-Plaintiff suffers prejudice, actual and substantial hardship, and irreparable injury.

68. Petitioner-Plaintiff has no adequate remedy at law

## FOURTH CLAIM

**Violation of the Fourth Amendment to the U.S. Constitution (unlawful arrest); 5 U.S.C. §§ 702, 706**

69. Plaintiff-Petitioner repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition-Complaint as if fully set forth herein.

70. Anderson was detained by federal immigration officials as removable when he entered the United States. The government exercised its discretion under the Immigration and Nationality Act to release him while he litigated that charge in immigration court. At the time of Anderson arrest, he had been living at liberty pursuant to a grant of humanitarian parole determination by federal immigration authorities.

71. Anderson's arrest by CBP after the Cheektowaga Police gave him an appearance ticket, is unreasonable and violates the Fourth Amendment.

## FIFTH CLAIM:
**Violation of the Administrative Procedures Act's Prohibition Against Arbitrary Agency Action and the *Accardi* Doctrine.**

72. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

73. The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations." *United States ex rel. Accardi Shaugnessy*, 347 U.S. 260, 266, 268 (1954); *see also Montilla v. I.N.S.*, 926 F.2d 162, 166-167 (2d Cir. 1991).

74. Pursuant to the *Accardi* doctrine, Respondents-Defendants are bound to apply and uphold the rules and regulations contained in the TEDS. They are further restricted from taking any actions that are arbitrary, capricious, an abuse of discretion, or not in accordance with law.

75. Respondents-Defendants' failure to abide by the TEDS—particularly the standards requiring less than 72 hours in CBP custody (TEDS 4.1) for processing and access to phone calls (TEDS 4.9), and the special requirements for "at-risk" detainees (TEDS 5.0) like Petitioner-Plaintiff such as expeditious processing (TEDS 5.6), placement in the least restrictive setting (TEDS 5.6), requiring reasonable accommodations (TEDS 5.1), and addressing the special communication needs of at-risk detainees (TEDS 5.1) and release of detainees (TEDS 5.1).

76. Petitioner-Plaintiff is in acute medical distress following his initial arrest and detention. He requires ongoing monitoring and care for his life-threatening illness, which neither CBP nor ICE can provide. According to his doctor, any placement in a detention setting poses significant risks to his life and health. If detained, it is anticipated he will not be able to function and will be unable to participate in his removal proceedings.

77. This constitutes arbitrary and capricious actions and violates the TEDS as, in the present circumstances, Respondents-Defendants place Petitioner-Plaintiff at a heightened risk of death. A reasonable accommodation is to release Anderson under reasonable conditions of supervision.

78. As a result of this ongoing violation, Petitioner-Plaintiff suffers prejudice, actual and substantial hardship, and irreparable injury.

79. Petitioner-Plaintiff has no adequate remedy at law.

## SIXTH CLAIM

**Violation of the First Amendment to the U.S. Constitution (access to courts and counsel); 5 U.S.C. §§ 702, 706**

80. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

81. Petitioner-Plaintiff has a First Amendment right to access to counsel which Respondent-Defendants have violated by denying him access to his attorney during his prolonged processing and detention in CBP custody.

## SEVENTH CLAIM

**Violation of section 504 of the Rehabilitation Act**

82. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

83. The Rehabilitation Act defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."[6] 42 U.S.C. § 12102(1). This definition includes chronic illness, as well as physical, intellectual, developmental, psychiatric, visual, and auditory disabilities. Margo Schlanger, Elizabeth Jordan, Roxana Moussavian, Ending the Discriminatory Pretrial Incarceration of People with Disabilities: Liability Under the

---

[6] 42 U.S.C. § 12102(2) defined "major life activities" as: "include[ing], but [] not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working...a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."

Americans with Disabilities Act and the Rehabilitation Act, 17 Harv. Law & Pol. Rev. 1, 237–48 (2022).

84. Evidence of a medical diagnosis is not required and proof from an individual's personal experience demonstrating that the impairment is substantial is sufficient to qualify for Section 504 protections. *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1194 (10th Cir. 2007) (applying an analogous analysis for how to determine whether an individual has a qualifying disability protected by the Americans with Disabilities Act). "[T]he same substantive standards apply under the Rehabilitation Act and the [Americans with Disabilities Act]." *Edmonds-Radford*, 17 F.4th at 986 (citation omitted).

85. Under Section 504, "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency." 29 U.S.C. § 794. DHS adopted binding regulations to ensure that Section 504 is implemented within the department and its agencies. 6 C.F.R. § 15.30, *et seq.* Section 504 forbids not only facial discrimination against individuals with disabilities, but also requires that executive agencies and departments, such as DHS, alter policies and practices to prevent discrimination on the basis of disability.

86. The terms "benefit, programs, and services" are construed broadly. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide [people who are incarcerated] with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit'" the people imprisoned); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (recognizing the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its

purposes").

87. In *Choate* the Supreme Court created the "meaningful access" standard: that "otherwise qualified" people with disabilities must be granted reasonable modifications to ensure they are "provided with meaningful access" to the program at issue. *Alexander v. Choate*, 469 U.S. 287, 300–02 n. 21 (1985). Namely, under Section 504 covered entities must afford persons with disabilities "'equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.'" *Id.* at 305 (citing 45 C.F.R. § 84.4(b)(2)). Meaningful access means equal access.

88. Anderson is unquestionably a "qualified individual with a disability," because his Sickle Cell Disease "substantially limit[s]" his "major life activities." *See generally* 42 U.S.C. § 12102(1) and (2) and Ex. 3, Letter of Dr. Ambrusko dated June 8, 2025 ("Since he already has an enlarged spleen, any trauma to his abdomen (as could easily happen in custody) and/or acute abdominal pain warrants immediate evaluation as it could represent splenic rupture, fatal if not emergently diagnosed and managed with prompt transfusion"), Ex. 1 Letter of Dr. Ambrusko dated June 10, 2025 ("[D]etention situations place him in direct risk of harm or death due to their conditions and lack of prompt medical care. Thus, placement of Anderson in a detention facility is AGAINST MEDICAL RECOMMENDATION").

89. Anderson's arrest and detention without any consideration of or ability to treat his disability violates the Rehabilitation Act. A reasonable accommodation is release with reasonable conditions of supervision.

90. Anderson's continued or future detention in CBP or ICE facilities directly contradicts his medical provider's recommendations, puts his life in danger, and will impair his ability to participate in his removal proceedings and violates the Rehabilitation Act.

## EIGHTH CLAIM

**Violation of the Administrative Procedure Act by Failing to Comply with Section 504 of the Rehabilitation Act and its implementing regulations.**

91. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

92. The Administrative Procedure Act (APA) empowers courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Under the APA, agency action that violates federal statute is arbitrary and unlawful and may be set aside by federal courts. 5 U.S.C. § 702(2)(A), (C) (empowering courts to set aside agency action that is "arbitrary and capricious," "otherwise not in accordance with law," or "short of statutory right"). *See also, Accardi v. Shaughnessy,* 347 U.S. 260, 268 (1954) (agencies must follow their own internal regulations and policies).

93. Anderson's arrest and detention while on humanitarian parole, without any consideration of or ability to treat his disability was arbitrary and capricious and violates the APA.

94. Anderson's continued or future detention in CBP or ICE facilities directly contradicts his medical provider's recommendations, puts his life in danger, and will impair his ability to participate in his removal proceedings, and violates the APA.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff-Petitioner respectfully requests the Court to grant the following relief:

1. Assume jurisdiction over this matter;

2. Enjoin the respondents from transferring the Petitioner-Plaintiff away from the jurisdiction of this District pending these proceedings;

3. Enjoin Respondents from moving Petitioner-Plaintiff without providing 72-hours notice to Petitioner-Plaintiff's counsel of any movement of Petitioner-Plaintiff.

4. Declare that the petitioner's arrest and detention violates the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, the Rehabilitation Act, the Fourth Amendment, the First Amendment right to access to counsel, and the Immigration and Nationality Act;

5. Issue a Writ of Habeas Corpus ordering Respondents to immediately release the Petitioner-Plaintiff from custody;

6. Order Respondent-Defendants to permit Petitioner-Plaintiff access to legal counsel;

7. Enjoin the Respondent-Defendants from transferring the Petitioner-Plaintiff to ICE custody;

8. Award Petitioner-Plaintiff his costs and reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 and on any other basis justified under law; and

9. Grant any other and further relief that this Court deems just and proper.

//

Respectfully Submitted,

DATED:    June 18, 2025
          Buffalo, NY

/s/Kerry Q. Battenfeld
Kerry Q. Battenfeld
Jillian E. Nowak
Catharine Grainge*
Prisoners' Legal Services of New York
14 Lafayette Sq. Ste. 510
Buffalo, NY 14203
T: (716) 844-8266
E: kbattenfeld@plsny.org

/s/ Sarah E. Decker
Sarah E. Decker
Staff Attorney
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Ste. 750
Washington, DC 20036
T: (646) 289-5593

E: decker@rfkhumanrights.org

/s/ Sarah T. Gillman
Sarah T. Gillman
Director of Strategic U.S. Litigation
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T: (646)289-5593
E: gillman@rfkhumanrights.org

*Attorneys for Petitioner-Plaintiff*

*\*Application for pro hac vice admission
forthcoming*

## 28 U.S.C. § 2242 VERIFICATION STATEMENT

I am submitting this verification on behalf of the Petitioner-Plaintiff because I am one of Petitioner-Plaintiff's attorneys. I have discussed with the Petitioner-Plaintiff the events described in this Petition and Complaint. On the basis of those discussions, I hereby verify that the statements made in this Petition and Complaint are true and correct to the best of my knowledge.

DATED:    June 18, 2025
           Buffalo, NY

Catharine Grainge
Staff Attorney
Prisoners' Legal Services of New York
14 Lafayette Sq. Ste. 510
Buffalo, NY 14203
T: (716) 844-8266
E: cgrainge@plsny.org

*Attorney for Petitioner-Plaintiff*
*Pro hac vice Admission Forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

ANDERSON CONTRERAS HERNANDEZ,

*Petitioner-Plaintiff,*

v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security; ROSE BROPHY, in her official capacity as Director of Field Operations, Buffalo Field Office, U.S. Customs and Border Protection; MARTIN COOMBS, in his official capacity as Patrol Agent in Charge, Buffalo Station, U.S. Border Patrol; STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement.

*Respondents-Defendants.*

Civil Action No.:

<span style="color:red">Corrected</span> **VERIFIED Petition for Writ of Habeas Corpus and Complaint for Injunctive Relief**

***Oral Argument Requested***

---

**<u>INTRODUCTION</u>**

1.  This case is about Anderson Contreras Hernandez ("Petitioner-Plaintiff" or "Anderson"), a 20-year-old young man from Venezuela who is receiving life-saving treatment at Oishei Children's Hospital ("Oishei") in Buffalo, NY, while detained by U.S. Customs and Border Protection ("CBP") custody. Anderson is being detained without access to counsel, at Oishei for "acute vaso-occlusive pain crisis with acute pain in his spleen," Ex. 1, Letter from Dr.

1

Ambrusko dated June 10, 2025, a complication of sickle-cell disease which causes life-threatening complications.

2. Anderson was diagnosed with Hereditary Hemolytic Anemia (Hemoglobinopathy SC), a type of Sickle Cell Disease,[1] at age 6. *See* Ex. 2 Letter of Doctor Montes. According to Anderson's current doctor, Steven J. Ambrusko, MD, MS, placement in any detention center would put Anderson in "direct risk of harm or death" due to conditions and the inability to provide prompt medical care. Ex. 3, Letter of Dr. Ambrusko dated June 10, 2025.

3. Through this petition and complaint, Anderson does not seek to challenge the government's removal proceedings against him. Instead, he claims that his arrest and detention are in violation of CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS"), the Administrative Procedure Act ("APA"), Section 504 of the Rehabilitation Act ("Section 504"), his First Amendment Right to Access to Counsel, the Fourth Amendment, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

4. To remedy this alleged violation, Anderson respectfully requests this Court to order the Respondent-Defendants to permit Anderson access to counsel, release Anderson from their custody, and enjoin his transfer to Immigration and Customs Enforcement Custody.

## **PARTIES**

5. Anderson is a native and citizen of Venezuela. He is currently receiving treatment at Oishei Children's Hospital due to an acute illness caused by his Sickle Cell Disease and is in the custody of CBP and USBP.

6. Respondent-Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). She is sued in her official capacity only. Secretary Mayorkas is charged with the

---

[1] *Sickle cell disease*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/12100-sickle-cell-disease, accessed June 14, 2025.

operations of DHS, including detention and removal actions taken by DHS's sub-agency, USBP.

7.  Respondent-Defendant Rose Brophy is the Director of Field Operations for the Buffalo Field Office of U.S. Customs and Border Protection (CBP). Director Brophy is charged with the operation of CPB, including USBP, which is a sub-office of CBP. She is sued in her official capacity.

8.  Respondent-Defendant Martin Coombs, is the Patrol Agent in Charge ("PAC") for the Buffalo Station of USBP. He is sued in his official capacity.

9.  Respondent-Defendant Stephen Kurzdorfer is sued in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement.

10. Respondent-Defendant Joseph Freden is sued in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility.

11. Respondent-Defendant Todd Lyons is sued in his official capacity as Acting Director U.S. Immigration and Customs Enforcement.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

13. The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All Writs Act); 28 U.S.C. § 2241 (habeas corpus); and 5 U.S.C. § 701 (the Administrative Procedure Act).

3

14. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), to grant injunctive and declaratory relief.

15. Venue is proper in the U.S. District Court for the Western District of New York because Respondents-Defendants are officers of United States agencies, Anderson currently resides within this District, and there is no real property involved in this action. *See* 28 U.S.C. § 1391(e)(1).

16. Administrative exhaustion is unnecessary because it would be futile.

## **RELEVANT FACTS AND PROCEDURAL HISTORY**

17. Anderson was born in 2005, in Venezuela. He was diagnosed at age six with Sickle Cell Disease. *See* Ex. 2. Letter of Dr. Montes.

18. Anderson presented himself to border officials in Brownsville, Texas on or about January 31, 2024 and requested the opportunity to seek asylum. *See* Ex. 4, Notice to Appear. Anderson was released from the border on humanitarian parole, *see* Ex. 5, 1-94 (showing DT class of admission); Ex. 6, CBP guidance on DT (parole) status, and given a court date of April 17, 2024. Ex. 4, Notice to Appear.  On that day, April 17, 2024, Anderson filed his Form I-589 Application for Asylum and for Withholding of Removal, based on his fear of return to Venezuela.

19. After living in New York City for three months, Anderson moved to Buffalo, New York where he continues to reside. Currently, he is scheduled for another Master Court Hearing on August 15, 2025 in New York, New York. *See* Ex. 7, EOIR Court Information.

20. On June 6, 2025, while shopping for a new outfit for his birthday, Anderson was accused of shoplifting and arrested by Cheektowaga Police Department. Upon information and belief, no

4

~~criminal charges were brought against~~ Anderson was given an appearance ticket. ~~Cheektowaga Police transferred him to~~ CBP thereafter took Anderson into custody ~~that same day~~.

21. Also on June 6, 2025, Anderson was brought to the Buffalo Border Patrol Station located at 600 Colvin Woods Pkwy, Tonawanda, NY 14150, for processing by USBP. Anderson Hernandez went into a Sickle Cell Crisis and was brought to Oishei Children's Hospital in Buffalo, NY. He was promptly admitted to the hospital for another vaso-occlusive pain crisis and spleen enlargement. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025.

22. Since his diagnosis of Sickle Cell Disease at the age of six, Anderson has received forty-seven blood transfusions, has had several occasions of acute chest syndrome (a severe complication involving pneumonia leading to red blood cells sickling into the lungs), and had a surgical resection of his lung. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025. He has also experienced many episodes of splenic sequestration during which his spleen grows in size and pools blood, similar to internal bleeding. *Id.* As noted by Dr. Ambrusko, these episodes can be fatal if not treated immediately. *Id.* Finally, Anderson also often suffers from vaso-occlusive pain crises that can result in severe pain episodes requiring aggressive pain control such as the use of oral narcotics or intravenous morphine. *Id.*

23. While living in Buffalo, NY, Anderson has received treatment from the Hematology Department at Oishei Children's Hospital and Roswell Park Comprehensive Cancer Center. *Id.* His medical provider has noted that his disease is even more severe than usually expected for his age and for his type of sickle cell disease. *Id.*

24. CBP will not be able to provide sufficient medical care for Anderson should he be transferred from the hospital to a CBP holding center. CBP holding centers are meant for short-term custody, usually 72 hours or less. While some facilities are able to contract with medical

providers, it seems that not all of them have this provision in place and end up relying upon local, external, medical facilities when a detainee is medically high-risk.[2]

25. The CBP holding facility in Tonawanda, NY is especially unable to provide appropriate care for Anderson because they have more non-citizens than usual, are holding non-citizens for longer periods of time, and are ill-equipped for basic provisions like food preparation and showers.[3]

26. Anderson, in addition to medical care and narcotic or intravenous pain medication, requires preventative care in the form of temperature, nutrition, and hydration controls. *See* Ex. 3, Letter from Dr. Ambrusko, dated June 8, 2025. Without those conditions acting as preventive measures, Anderson is increasingly likely to have another acute crisis. *Id.* Should Anderson receive trauma to his abdomen, his spleen could rupture, a situation that could be fatal within minutes. *Id.* Furthermore, soon he will be in need of surgery to remove his spleen. *Id.* This will require visits for preoperative assessments, the surgery itself, as well as postoperative care. *Id.* Of note, correction facilities, which often bear very similar, if not exact, infrastructure to immigration detention centers, are considered "high-risk" congregate settings for infectious diseases, a concern for anyone preparing for or recovering from surgery.[4]

---

[2] U.S. Department of Homeland Security, U.S. Customs and Border Protection, Office of the Chief Medical Officer. CBP Directive No. 2210-004 *Enhanced Medical Support Efforts,* Date: May 21, 2024, Accessed June 13, 2025. https://www.cbp.gov/sites/default/files/2025-02/supplemental_guidance_to_enhanced_medical_directive.pdf.

[3] Investigative Post, Shoemaker. "Feds adding Migrant Detention Centers in Buffalo Area." June 13, 2025. Accessed on June 13, 2025. https://www.investigativepost.org/2025/06/13/feds-adding-migrant-detention-centers-in-buffalo-area/.

[4] Kendig, Newton E et al. "Infection Prevention and Control in Correctional Settings." *Emerging infectious diseases* vol. 30,13 (2024): S88-S93. doi:10.3201/eid3013.230705.

27. Per Anderson's medical provider, Dr. Ambrusko, placement in any detention center would put Anderson in "direct risk of harm or death" due to conditions and the inability to provide prompt medical care. *See* Ex. 1, Letter from Dr. Ambrusko and Dr. Carlberg dated June 10, 2025.

28. Upon information and belief, it is Petitioner and counsel's understanding that Defendant-Respondents intend to transfer Anderson to Immigration and Customs Enforcement ("ICE") custody and detain him in a federal immigration detention facility.

29. Since Anderson was taken into custody on June 6, 2025, he has been denied access to counsel on several occasions. Upon information and belief, officers from either CBP or USBP have been posted outside of Anderson's hospital room since his arrival at Oishei on June 7, 2025.

30. Anderson is represented by PLS attorney Catherine Grainge. Attorney Grainge went to Oishei Children's Hospital around 4 P.M. for a legal meeting with Anderson. During the meeting, an officers asked to speak with Attorney Grainge and informed her she would not be permitted to meet with Anderson. Ex. 8, Dec. of Attorney Grainge.

31. When Attorney Grainge asked what policy the officer was relying on to prevent her from meeting with her client, the Officer said it was on his own authority. Attorney Grainge left the hospital room. *Id.*

32. On June 9, 2025 around 7 P.M. Attorney Grainge returned to Oishei to meet with Anderson for a legal visit and was permitted to enter the hospital room and meet with Anderson. *Id.*

33. On June 12, 2025 around 8 A.M. Ms. Grainge went to Oishei Hospital to meet with Anderson for a legal visit. She was informed by an Officer named "Dan" that he was told Anderson was not permitted any visitors and that he would need to check with a supervisor about whether Attorney Grainge could meet with Anderson. *Id.*

34. The Officer reached out to his supervisor, Officer Adam Matuszewski, who in turn, reached out to his supervisor, PAC Martin Coombs, named Respondent-Defendant in this case. Attorney Grainge was given the number for PAC Coombs and called him. PAC Coombs informed her that she would not be permitted to meet with Anderson. *Id.*

35. Attorney Grainge informed PAC Coombs that she believed this was a violation of Anderson's right to access to counsel. PAC Coombs then informed Attorney Grainge he would call her back. PAC Coombs called Attorney Grainge back a few minutes later and confirmed she would not be permitted to visit Anderson. *Id.*

36. On June 13, 2025 around 3 P.M. Attorney Grainge called Oishei Hospital to speak with Anderson. She was transferred to Anderson's social worker at the hospital who informed Attorney Grainge that due to unclear and inconsistent guidance from CBP she did not feel comfortable providing Anderson with a phone to speak with Attorney Grainge. *Id.*

37. Dr. Ambrusko states that Anderson "currently has further painful enlargement of his spleen, putting him at risk for rupture of the spleen, splenic sequestration, and/or splenic infarction – all of which can be fatal if untreated." Letter of Dr. Ambrusko dated June 8, 2025. Anderson requires narcotic pain medication and is currently on IV morphine as needed. *Id.* He is unable to take other pain medications as "he has a severe allergy to NSAIDs" and other drugs like acetaminophen are "largely ineffective" for this condition. *Id.*

38. Dr. Ambrusko recommends Anderson consult with a surgeon to discuss removal of his spleen as a result of this most recent acute episode. This will require preoperative transfusion of red blood cells and further hospitalization. *Id.*

39. Anderson will not have access to the life-sustaining care he requires if returned to a CBP facility or in the event he is transferred to ICE custody. Per Dr. Ambrusko, "sickle cell disease

complications are unpredictable and can become severe very quickly, within hours to minutes. Exposure to extremes in temperature (as is more likely in prison/jail setting) is a frequent trigger for sickle cell disease complications to occur, especially painful vaso-occlusive crises that will be made worse if he cannot receive oral narcotic medication promptly or get access to emergency care for immediate IV narcotic treatment. Since he already has an enlarged spleen, any trauma to his abdomen (as could easily happen in custody) and/or acute abdominal pain warrants immediate evaluation as it could represent splenic rupture, fatal if not emergently diagnosed and managed with prompt transfusion." Ex. 3, Letter of Dr. Ambrusko dated June 8, 2025.

40. Further, placement in detention will put Anderson at increased risk of complications and he will not have access to the preventive care he requires to maintain his health and avoid life-threatening complications from his Sickle Cell Disease. These include "regular outpatient care, and adequate preventative care at home including good nutrition & hydration, secure housing with temperature control, and resources to avoid certain triggers that can induce sickle cell crises." *Id.*

41. The severity of Anderson's Sickle Cell Disease and the quick onset of potentially fatal complications puts Anderson at risk of severe bodily harm or death if he is placed in a detained setting. These complications will also limit his ability to participate fully in his removal proceedings.

**LEGAL FRAMEWORK**

**CBP'S National Standards on Transport, Escort, Detention, and Search**

42. The National Standards on Transport, Escort, Detention, and Search 2015 (TEDS)[5] outlines the rules and regulations that guide CBP actions as they relate to CBP's interactions with detained individuals.

43. "The new policy document is grounded firmly in the experience and policies of the Office of Field Operations and the United States Border Patrol. It incorporates best practices developed in the field, and it reflects key legal and regulatory requirements. In addition to transport, escort, detention and search provisions, TEDS also includes requirements related to: sexual abuse and assault prevention and response; care of at-risk individuals in custody; and personal property." TEDS, Foreword from the Commissioner, p. 3.

44. The TEDS defines "at-risk populations/at-risk Detainees" as Individuals in the custody of CBP who may require additional care or oversight, who may include: . . . those known to be on life-sustaining or life-saving medical treatment; . . . those who have identified mental, physical or developmental disabilities." TEDS, Section 8.0, Definitions, p 28.

45. Section 3.11 on Medical Treatment and Authority at a Medical Facility states that "Once a detainee is at a medical facility, medical practitioners make all medical decisions which may include medical release or fitness for travel. Officers/Agents have no authority over the detainee's medical treatment, but remain responsible for enforcement decisions regarding the detainee."

46. Section 4.1 on Duration of Detention states that "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to

---

[5] Available at: https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search

hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

47. The TEDS require CBP officers to "determine if the detainee may be considered an at-risk detainee" "[b]efore placing any detainees together in a hold room or holding facility."

48. The TEDS also require that "Detainees referred for removal proceedings shall be provided with a list of legal service providers and their contact information." TEDS, Section 4.8 Consular Contact and List of Legal Service Providers, p. 16.

49. The TEDS further provide that "Officers/Agents must grant detainees telephone access per the operational office's policies and procedures and may, at their discretion, grant telephone access to any detainee even if not required."

50. TEDS policy for hospitalized detainees states: "If the detainee is hospitalized, officers/agents will follow their operational office's policies and procedures, and document the hospitalization in the appropriate electronic system(s) of record.  At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation." TEDS 4.10, Medical, Hospitalization, p 17.

51. The TEDS policy for at-risk populations states that "CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability" and that "[r]easonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations."

52. Further, the TEDS policy for at-risk detainees states that "[e]xtra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms." TEDS, Section 5.1 General, p. 19.

53. The TEDS Detention standards requires "expeditious processing" and placement n the "least restrictive setting appropriate to their age and special needs, provided that the such setting is consistent with the need to ensure the safety and security of the detainees and that of others." TEDS, Section 5.6, p. 22.

54. The TEDS prohibit release of an at-risk detainee "to any person or entity that officers/agents have reason to believe may harm or neglect the at-risk detainee." TEDS, section 5.1, p 19.

## CAUSES OF ACTION

### FIRST CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Substantive Due Process); 5 U.S.C. §§ 702, 706**

55. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

56. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691.

57. Petitioner-Plaintiff is not a flight risk nor is he a danger to the community. Respondents' detention of Anderson is therefore unjustified and unlawful. Accordingly, Petitioner-Plaintiff is being detained in violation of his Constitutional right to Due Process under the Fifth Amendment.

## SECOND CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Substantive Due Process—State created danger); 5 U.S.C. §§ 702, 706**

58. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

59. Petitioner-Plaintiff alleges that Respondent-Defendants actions in detaining him in light of his serious and life-threatening medical needs, violates his substantive due process rights.

60. When government actors are deliberately indifferent to the medical needs of individuals in conduct is egregious enough to constitute a violation of the individual's right to substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998).

61. Substantive due process also precludes a state actor from affirmatively acting to create or enhance a danger that will ultimately harm an individual. *See Butera v. D.C.*, 235 F.3d 637, 649–51 (D.C. Cir. 2001) (citing cases). The State "owes a duty of protection when its agents create or increase the danger to an individual." *Id.*; *see also Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (due process was violated where police officers left detainee in a more dangerous neighborhood, away from public transportation and without a cell phone); *Wang v. Reno*, 81 F.3d 808, 817 (9th Cir. 1996) (noncitizen could not be removed to China where U.S. government convinced him to testify about topic that would lead Chinese government to torture and possibly execute him). Due process is implicated when the state actor's conduct in such a case is "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Butera*, 235 F.3d at 651 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

62. Respondents-Defendants are on notice that Anderson's life will be in danger if he is placed in a detention setting, and that he requires additional surgeries to address his current medical

needs. *See* Ex. 3 Letter of Dr. Ambrusko dated June 8, 2025; Ex. 1 Letter of Dr. Ambrusko dated June 10, 2025.

63. Respondents-Defendants' actions in arresting, detaining, and continuing to detain Petitioner-Plaintiff in light of his serious and life-threatening medical needs is egregious and shocks the conscience.

### THIRD CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Procedural Due Process); 5 U.S.C. §§ 702, 706**

64. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

65. The Fifth Amendment of the United States Constitution guarantees that noncitizens receive adequate procedural protections in the course of any executions of the government's detention and removal authorities. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Such protections are flexible and guided by considerations for the "private interest that will be affected[,]" "the risk of an erroneous deprivation of such interest through the procedures used[,]" and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

66. The government made the reasoned decision to release Anderson from detention while he pursued his asylum claim in the United States. The Due Process Clause entitles Anderson to meaningful process assessing whether his detention is justified. The arrest and detention of Anderson without an opportunity for Anderson to contest his detention in front of a neutral decisionmaker after he had been living and working and participating in his immigration

removal proceedings in the United States for over sixteen months provide insufficient process and violates the Due Process Clause of the Fifth Amendment of the Constitution.

67. As a result of this ongoing violation, Petitioner-Plaintiff suffers prejudice, actual and substantial hardship, and irreparable injury.

68. Petitioner-Plaintiff has no adequate remedy at law

## FOURTH CLAIM

### Violation of the Fourth Amendment to the U.S. Constitution (unlawful arrest); 5 U.S.C. §§ 702, 706

69. Plaintiff-Petitioner repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition-Complaint as if fully set forth herein.

70. Anderson was detained by federal immigration officials as removable when he entered the United States. The government exercised its discretion under the Immigration and Nationality Act to release him while he litigated that charge in immigration court. At the time of Anderson arrest, he had been living at liberty pursuant to a grant of humanitarian parole determination by federal immigration authorities.

71. Anderson's arrest by CBP transfer to USBP custody byafter the Cheektowaga Police Officer who arrested him, but did not charge him with any crimegave him an appearance ticket, is unreasonable and violates the Fourth Amendment.

## FIFTH CLAIM:

### Violation of the Administrative Procedures Act's Prohibition Against Arbitrary Agency Action and the *Accardi* Doctrine.

72. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

73. The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations." *United States ex rel. Accardi Shaugnessy*, 347 U.S. 260, 266, 268 (1954); *see also Montilla v. I.N.S.*, 926 F.2d 162, 166-167 (2d Cir. 1991).

74. Pursuant to the *Accardi* doctrine, Respondents-Defendants are bound to apply and uphold the rules and regulations contained in the TEDS. They are further restricted from taking any actions that are arbitrary, capricious, an abuse of discretion, or not in accordance with law.

75. Respondents-Defendants' failure to abide by the TEDS—particularly the standards requiring less than 72 hours in CBP custody (TEDS 4.1) for processing and access to phone calls (TEDS 4.9), and the special requirements for "at-risk" detainees (TEDS 5.0) like Petitioner-Plaintiff such as expeditious processing (TEDS 5.6), placement in the least restrictive setting (TEDS 5.6), requiring reasonable accommodations (TEDS 5.1), and addressing the special communication needs of at-risk detainees (TEDS 5.1) and release of detainees (TEDS 5.1).

76. Petitioner-Plaintiff is in acute medical distress following his initial arrest and detention. He requires ongoing monitoring and care for his life-threatening illness, which neither CBP nor ICE can provide. According to his doctor, any placement in a detention setting poses significant risks to his life and health. If detained, it is anticipated he will not be able to function and will be unable to participate in his removal proceedings.

77. This constitutes arbitrary and capricious actions and violates the TEDS as, in the present circumstances, Respondents-Defendants place Petitioner-Plaintiff at a heightened risk of

death. A reasonable accommodation is to release Anderson under reasonable conditions of supervision.

78. As a result of this ongoing violation, Petitioner-Plaintiff suffers prejudice, actual and substantial hardship, and irreparable injury.

79. Petitioner-Plaintiff has no adequate remedy at law.

## SIXTH CLAIM

**Violation of the First Amendment to the U.S. Constitution (access to courts and counsel); 5 U.S.C. §§ 702, 706**

80. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

81. Petitioner-Plaintiff has a First Amendment right to access to counsel which Respondent-Defendants have violated by denying him access to his attorney during his prolonged processing and detention in CBP custody.

## SEVENTH CLAIM

**Violation of section 504 of the Rehabilitation Act**

82. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

83. The Rehabilitation Act defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."[6] 42 U.S.C. § 12102(1). This definition includes chronic illness, as well as physical, intellectual, developmental, psychiatric, visual,

---

[6] 42 U.S.C. § 12102(2) defined "major life activities" as: "include[ing], but [] not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working...a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."

and auditory disabilities. Margo Schlanger, Elizabeth Jordan, Roxana Moussavian, Ending the Discriminatory Pretrial Incarceration of People with Disabilities: Liability Under the Americans with Disabilities Act and the Rehabilitation Act, 17 Harv. Law & Pol. Rev. 1, 237–48 (2022).

84. Evidence of a medical diagnosis is not required and proof from an individual's personal experience demonstrating that the impairment is substantial is sufficient to qualify for Section 504 protections. *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1194 (10th Cir. 2007) (applying an analogous analysis for how to determine whether an individual has a qualifying disability protected by the Americans with Disabilities Act). "[T]he same substantive standards apply under the Rehabilitation Act and the [Americans with Disabilities Act]." *Edmonds-Radford*, 17 F.4th at 986 (citation omitted).

85. Under Section 504, "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency." 29 U.S.C. § 794. DHS adopted binding regulations to ensure that Section 504 is implemented within the department and its agencies. 6 C.F.R. § 15.30, *et seq.* Section 504 forbids not only facial discrimination against individuals with disabilities, but also requires that executive agencies and departments, such as DHS, alter policies and practices to prevent discrimination on the basis of disability.

86. The terms "benefit, programs, and services" are construed broadly. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide [people who are incarcerated] with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit'" the people imprisoned); *see*

*also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (recognizing the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes").

87. In *Choate* the Supreme Court created the "meaningful access" standard: that "otherwise qualified" people with disabilities must be granted reasonable modifications to ensure they are "provided with meaningful access" to the program at issue. *Alexander v. Choate*, 469 U.S. 287, 300–02 n. 21 (1985). Namely, under Section 504 covered entities must afford persons with disabilities "'equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.'" *Id.* at 305 (citing 45 C.F.R. § 84.4(b)(2)). Meaningful access means equal access.

88. Anderson is unquestionably a "qualified individual with a disability," because his Sickle Cell Disease "substantially limit[s]" his "major life activities." *See generally* 42 U.S.C. § 12102(1) and (2) and Ex. 3, Letter of Dr. Ambrusko dated June 8, 2025 ("Since he already has an enlarged spleen, any trauma to his abdomen (as could easily happen in custody) and/or acute abdominal pain warrants immediate evaluation as it could represent splenic rupture, fatal if not emergently diagnosed and managed with prompt transfusion"), Ex. 1 Letter of Dr. Ambrusko dated June 10, 2025 ("[D]etention situations place him in direct risk of harm or death due to their conditions and lack of prompt medical care. Thus, placement of Anderson in a detention facility is AGAINST MEDICAL RECOMMENDATION").

89. Anderson's arrest and detention without any consideration of or ability to treat his disability violates the Rehabilitation Act. A reasonable accommodation is release with reasonable conditions of supervision.

90. Anderson's continued or future detention in CBP or ICE facilities directly contradicts his medical provider's recommendations, puts his life in danger, and will impair his ability to participate in his removal proceedings and violates the Rehabilitation Act.

### EIGHTH CLAIM

**Violation of the Administrative Procedure Act by Failing to Comply with Section 504 of the Rehabilitation Act and its implementing regulations.**

91. Petitioner-Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

92. The Administrative Procedure Act (APA) empowers courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Under the APA, agency action that violates federal statute is arbitrary and unlawful and may be set aside by federal courts. 5 U.S.C. § 702(2)(A), (C) (empowering courts to set aside agency action that is "arbitrary and capricious," "otherwise not in accordance with law," or "short of statutory right"). *See also, Accardi v. Shaughnessy,* 347 U.S. 260, 268 (1954) (agencies must follow their own internal regulations and policies).

93. Anderson's arrest and detention while on humanitarian parole, without any consideration of or ability to treat his disability was arbitrary and capricious and violates the APA.

94. Anderson's continued or future detention in CBP or ICE facilities directly contradicts his medical provider's recommendations, puts his life in danger, and will impair his ability to participate in his removal proceedings, and violates the APA.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff-Petitioner respectfully requests the Court to grant the following relief:

1. Assume jurisdiction over this matter;

2.  Enjoin the respondents from transferring the Petitioner-Plaintiff away from the jurisdiction of this District pending these proceedings;

3.  Enjoin Respondents from moving Petitioner-Plaintiff without providing 72-hours notice to Petitioner-Plaintiff's counsel of any movement of Petitioner-Plaintiff.

4.  Declare that the petitioner's arrest and detention violates the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, the Rehabilitation Act, the Fourth Amendment, the First Amendment right to access to counsel, and the Immigration and Nationality Act;

5.  Issue a Writ of Habeas Corpus ordering Respondents to immediately release the Petitioner-Plaintiff from custody;

6.  Order Respondent-Defendants to permit Petitioner-Plaintiff access to legal counsel;

7.  Enjoin the Respondent-Defendants from transferring the Petitioner-Plaintiff to ICE custody;

8.  Award Petitioner-Plaintiff his costs and reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 and on any other basis justified under law; and

9.  Grant any other and further relief that this Court deems just and proper.

  //

                                              Respectfully Submitted,


DATED:   June ~~17~~18, 2025                   /s/Kerry Q. Battenfeld
         Buffalo, NY                          Kerry Q. Battenfeld
                                              Jillian E. Nowak
                                              Catharine Grainge*
                                              Prisoners' Legal Services of New York
                                              14 Lafayette Sq. Ste. 510
                                              Buffalo, NY 14203
                                              T: (716) 844-8266
                                              E: kbattenfeld@plsny.org

                                              /s/ Sarah E. Decker
                                              Sarah E. Decker
                                              Staff Attorney

ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Ste. 750
Washington, DC 20036
T: (646) 289-5593
E: decker@rfkhumanrights.org

/s/ Sarah T. Gillman
Sarah T. Gillman
Director of Strategic U.S. Litigation
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T: (646)289-5593
E: gillman@rfkhumanrights.org

*Attorneys for Petitioner-Plaintiff*

*Application for pro hac vice admission
forthcoming*

## **EXHIBITS**

1.      Letter from Steven J. Ambrusko, MD, MS dated June 8, 2025

2.      Letter from Dr. Montes with certified English translation

3.      Letter from Steven J. Ambrusko, MD, MS dated June 10, 2025

4.      Notice to Appear dated January 31, 2024

5.      I-94 Showing admission in class DT

6.      CBP Guidance on DT admission

7.      EOIR Court Notice

8.      Declaration of Attorney Catharine Grainge

# Exhibit 1



**Sickle Cell & Hemoglobinopathy Center of Western New York**
Childhood Cancer & Blood Disorders Program at
Roswell Park Cancer Institute and Oishei Children's Hospital
665 Elm Street, Buffalo, New York 14263
Clinic: 716-845-4447; Fax: 716-845-3588; Office: 716-845-2333

8 June 2025

Catherine Grainge
Prisoners Legal Services of New York
14 LaFayette Square, Buffalo, New York 14203
Office: 716-364-5359;  Email: cgrainge@plsny.org

**RE:    Anderson Contreras-Hernandez, DOB ▬ 2005**

To Whom It May Concern,

      I write this letter on behalf of my patient, Anderson Contreras-Hernandez, a young man cared for at Oishei Children's Hospital & Roswell Park Comprehensive Cancer Center, where I am a pediatric hematologist and medical director of our Sickle Cell & Hemoglobinopathy Center of Western New York.  Anderson has sickle cell disease, type SC, an inherited congenital blood disease that is usually progressively worse with age, with many potential complications, several of which can be life-threatening.  It affects the hemoglobin protein in the red blood cells, causing those red blood cells to become rigidly deformed, which blocks blood vessels (which impairs blood flow and can damage the body's organs), and causes destruction of red blood cells more rapidly, leading to anemia.

      In Anderson's case, he has had even more severe disease than usually expected for his age and for his type of sickle cell disease.  He has history of numerous episodes of anemia or other complications severe enough to require emergent blood transfusions, by report 47 transfusions total!  These complications have included several episodes of acute chest syndrome (a severe complication involving pneumonia leading to red blood cell sickling in the lungs), even so severe that he required surgical resection of a portion of his lung.  He has also had many episodes of splenic sequestration, in which the spleen rapidly becomes much more enlarged with blood pooling in the spleen (similar to internal bleeding), often requiring emergent blood transfusion; these episodes can be fatal if not treated promptly.  He also has had an apparent severe bone infection (of his right leg) requiring surgery, with complication of a severe post-operative infection.  Additionally, he has had many vaso-occlusive pain crises, a common sickle cell disease complication characterized by mild to severe pain episodes requiring immediate and aggressive pain control.

      Currently, Anderson is admitted to the hospital for another vaso-occlusive pain crisis and spleen enlargement.  Regarding his vaso-occlusive pain crisis episode, often they can be treated with ibuprofen (an NSAID medication), but Anderson cannot receive it as he has has a severe allergy to NSAIDs; while acetaminophen can be used, it is largely ineffective for sickle cell disease-related vaso-occlusive pain.  Thus, he requires narcotic pain medication for these pain episodes: for mild-moderate pain, he must be treated with oral narcotics like hydrocodone or oxycodone; more moderate-severe pain requires intravenous narcotics like IV morphine or



**Sickle Cell & Hemoglobinopathy Center of Western New York**
Childhood Cancer & Blood Disorders Program at
Roswell Park Cancer Institute and Oishei Children's Hospital
665 Elm Street, Buffalo, New York 14263
Clinic: 716-845-4447; Fax: 716-845-3588; Office: 716-845-2333

Dilaudid. In his case, he is currently requiring IV morphine as needed. While his spleen is chronically enlarged, this admission he also currently has further painful enlargement of his spleen, putting him at risk for rupture of the spleen, splenic sequestration, and/or splenic infarction – all of which can be fatal if untreated. During this current hospitalization, he was seen by one of our surgical colleagues for this issue.

Regarding his sickle cell disease overall, he has risk for ongoing complications requiring access to prompt emergency care for any acute complications, regular outpatient care, and adequate preventative care at home including good nutrition & hydration, secure housing with temperature control, and resources to avoid certain triggers that can induce sickle cell crises. In fact, since coming to the United States, he and his family feel that his sickle cell disease has been better controlled because they have had access to these measures. While living in Venezuela prior to arriving in the United States, his sickle cell disease was far worse with more frequent complications. If he were made to return to Venezuela, especially without family support, would most likely result in his death from sickle cell disease in a short period of time.

Now that he is in legal custody, he is at far greater risk for sickle cell disease complications. Making matters worse is that sickle cell disease complications are unpredictable and can become severe very quickly, within hours to minutes. Exposure to extremes in temperature (as is more likely in prison/jail setting) is a frequent trigger for sickle cell disease complications to occur, especially painful vaso-occlusive crises that will be made worse if he cannot receive oral narcotic medication promptly or get access to emergency care for immediate IV narcotic treatment. Since he already has an enlarged spleen, any trauma to his abdomen (as could easily happen in custody) and/or acute abdominal pain warrants immediate evaluation as it could represent splenic rupture, fatal if not emergently diagnosed and managed with prompt transfusion. As I have discussed with Anderson, he has such chronic issues with his spleen that, after this acute episode, I highly recommend that he visit with a surgeon for outpatient evaluation to discuss surgical removal of the spleen (called splenectomy). If he agrees to this, he then needs a visit for preoperative exchange transfusion of red blood cells, followed by hospitalization for the surgical splenectomy itself.

I am happy to assist you, and my patient Anderson, in whatever way necessary. Thank you for your time.

Sincerely,

Steven J. Ambrusko, MD, MS
Director – Sickle Cell & Hemoglobinopathy Center of Western New York
Clinical Assistant Professor of Pediatrics – Hematology/Oncology
Childhood Cancer & Blood Disorders Program
Roswell Park Comprehensive Cancer Center & Oishei Children's Hospital

Exhibit 2



**Republica Bolivariana de Venezuela**
Ministerio del Poder Popular para el Trabajo y la Seguridad Social
Instituto Venezolano de los Seguros Sociales
Hospital "Dr. José Francisco Molina Sierra"
Puerto Cabello – Estado Carabobo

# Informe Médico

Paciente:   **ANDERSON RAFAEL, CONTRERAS HERNANDEZ**
Edad:      **06 Años**
Nro. de Historia Clínica: **18 – 76 – 43**
Cédula de Identidad Madre: **V.- 15.977.030**

Se trata de paciente masculino de seis (06) años de edad, conocido de este Centro Hospital por presentar diagnostico **ANEMIA HEMOLÍTICA HEREDITARIA** (Hemoglobinopatía SC) en tratamiento permanente con Ácido Fólico y Controles periódicos por la consulta de Hematología mensualmente. Ha presentado crisis hemolíticas y/o dolorosas a repetición motivo por el cual amerita tratamiento y evaluaciones periódicas. Además tiene contraindicado realizar Educación Física y/o Deportes por la posibilidad de deshidratación y descompensación hemodinámica (maneja cifras de Hb y Hto muy bajas).

Informe médico que se expide a petición de la parte interesada en la ciudad de Puerto Cabello a los veintinueve días del mes de Marzo del año dos mil doce.

*Dra. Marianella Montes R.*
Medico Adjunto Hematologo
Clave: 30.318

MMR/elimorandy
29032012



**UNIDAD DE BANCO DE SANGRE, HEMATO - ONCOLOGIA**
Hospital "Dr. José Francisco Molina Sierra"
Dirección: Avenida Juan José Flores, Frente al Estadium Independencia
Telf 0242-4155729

**Bolivarian Republic of Venezuela**
**Ministry of Popular Power for Labor and Social Security**
Venezuelan Social Security Institute
Dr. Jose Francisco Molina Sierra Hospital
Puerto Cabello – Carabobo State

# Medical Report

| | |
|---|---|
| Patient: | **ANDERSON RAFAEL, CONTRERAS HERNANDEZ** |
| Age: | **6 years old** |
| Medical Record Number: | **18 – 76 – 43** |
| Mother's ID Card Number: | **V.-15.977.030** |

This is a six (06) year old male patient, known to this Hospital Center for presenting a diagnosis of **HEREDITARY HEMOLYTIC ANEMIA** (Hemoglobinopathy SC) under permanent treatment with Folic Acid and periodic check-ups by the Hematology Department on a monthly basis. He has experienced repeated hemolytic and/or painful crises, which require periodic treatment and evaluation. In addition, he is contraindicated for physical education and/or sports due to the possibility of dehydration and hemodynamic decompensation (he has very low Hb and Hto levels).

Medical report issued at the request of the interested party in the city of Puerto Cabello on the twenty-ninth day of March of the year two thousand and twelve.

[signature]
Dr. Marianella Montes R.
Assistant Hematologist
Code: 30.318

MMr/elimorandy
29032012

BLOOD BANK UNIT, HEMATOLOGY-ONCOLOGY
Dr. Jose Francisco Molina Sierra Hospital
Address: Avenida Juan Jose Jose Flores, opposite the Independencia Stadium
Tel: 0242-4155729

# CERTIFICATE OF TRANSLATION

I, Gina Andrade, am competent to translate from Spanish into English, and certify
that the translation of

_Medical Report_

(names of documents)

6/13/25

Date

is true and accurate to the best of my abilities.

(signature of translator)

Gina Andrade

(printed name of translator)

41 State St. Ste. M112

(address of translator)

Albany, NY 12207

(address of translator)

(518) 694-8699

(telephone number of translator)

Exhibit 3



**Sickle Cell & Hemoglobinopathy Center
of Western New York**
Childhood Cancer & Blood Disorders Program at
Roswell Park Cancer Institute and Oishei Children's Hospital
665 Elm Street, Buffalo, New York 14263
Clinic: 716-845-4447; Fax: 716-845-3588; Office: 716-845-2333

10 June 2025

Catherine Grainge
Prisoners Legal Services of New York
14 LaFayette Square, Buffalo, New York 14203
Office: 716-364-5359;  Email: cgrainge@plsny.org

**RE:     Anderson Contreras-Hernandez, DOB ████ 2005**

To Whom It May Concern,

    We write this additional letter on behalf of our patient, Anderson Contreras-Hernandez, a young man with sickle cell disease (SC-type) cared for at Oishei Children's Hospital & Roswell Park Comprehensive Cancer Center, where we are pediatric hematologists. Dr. Ambrusko is also the medical director of our Sickle Cell & Hemoglobinopathy Center of Western New York.  We have already provided you a letter dated 8 June 2025 summarizing Anderson's medical history and condition.  Briefly, he is in the hospital now for acute vaso-occlusive pain crisis with acute pain in his spleen as well.  These, and other potential complications of his sickle cell disease, can be severe, life-threatening, or even fatal.

    Given the potential severity of Anderson's medical condition, it is our official medical recommendation that he MUST NOT be placed in any detention facility.  This includes, but is not limited to, the inadequate facility of the Border Patrol at which he was previously, or any Immigration & Customs Enforcement (ICE) detention facility.  These detention situations place him in direct risk of harm or death due to their conditions and lack of prompt medical care.  Thus, **placement of Anderson in a detention facility is AGAINST MEDICAL RECOMMENDATION; to do so is to assume responsibility and liability for any adverse outcome that would befall him if it were to occur**.

    As always, we are happy to assist you, and our patient Anderson, in whatever way necessary. Thank you for your time.

Sincerely,

Steven J. Ambrusko, MD, MS
Director – Sickle Cell & Hemoglobinopathy Center of Western New York
Clinical Assistant Professor of Pediatrics – Hematology/Oncology
Childhood Cancer & Blood Disorders Program
Roswell Park Comprehensive Cancer Center & Oishei Children's Hospital

Katie Carlberg, MD
Clinical Assistant Professor of Pediatrics – Hematology/Oncology
Childhood Cancer & Blood Disorders Program
Roswell Park Comprehensive Cancer Center & Oishei Children's Hospital

Exhibit 4

# DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

Event No: BRO2401012150

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID : 208417217  FIN #: 1354440880

SIGMA Event: 58901779   DOB: ___2005

File No: 244376255

In the Matter of: CONTRERAS HERNANDEZ, ANDERSON RAFAEL

Respondent: CONTRERAS HERNANDEZ, Anderson Rafael                     currently residing at:

_____

(Number, street, city, state and ZIP code)                (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of VENEZUELA and a citizen of VENEZUELA;
3. On or about January 31, 2024, you applied for admission to the United States at the Brownsville, Texas Port of Entry;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law.
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:        [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
1961 STOUT ST STE 3101,
DENVER, CO, US 80294

*(Complete Address of Immigration Court, including Room Number, if any)*

on April 17, 2024       at 01:00 PM              to show why you should not be removed from the United States based on the
  *(Date)*              *(Time)* SERRATO, Denise

charge(s) set forth above.                CBP OFFICER                       D. Serrato

                              *(Signature and Title of Issuing Officer)*    *Digitally Acquired Signature*

Date: January 31, 2024       Brownsville, TEXAS
                              *(City and State)*

DHS Form I-862 (6 /22)                                        Page 1 of 4

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form 1-589, Application for Asylum and for Withholding of Removal. The Form 1-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/I-589.** Failure to file the Form 1-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
(Signature of Respondent)

Date: _____

_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>January 31, 2024</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person  [ ] by certified mail, returned receipt # _____ requested  [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ SPANISH _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

ANDERSON.C                                        SERRATO, Denise                     D. Serrato
_____          CBP OFFICER                     _____
*Digitally Acquired Signature*                                                   *Digitally Acquired Signature*
*(Signature of Respondent if Personally Served)*          *(Signature and Title of officer)*

# Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

Department of Homeland Security

Continuation Page for Form I-862

| Alien's Name | File Number A-244-376-255 | Date |
|---|---|---|
| CONTRERAS HERNANDEZ, ANDERSON RAFAEL | SIGMA Event: 58901779 | January 31, 2024 |
| | Event No: BRO2401012150 | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
========================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| D. Serrato)    SERRATO, Denise | CBP OFFICER |

*Digitally Acquired Signature*

<u>4</u> of <u>4</u> Pages

Form I-831 Continuation Page (Rev. 08/01/07)

Exhibit 5

I94 - Official Website

 For: ANDERSON RAFAEL CONTRERAS HERNANDEZ



## U.S. Customs and Border Protection
Securing America's Borders

## Most Recent I-94

Admission (I-94) Record Number : 748425417A3

Most Recent Date of Entry: 2024 January 31

Class of Admission : DT

Admit Until Date : 01/29/2025

Details provided on the I-94 Information form:

| | |
|---|---|
| Last/Surname : | CONTRERAS HERNANDEZ |
| First (Given) Name : | ANDERSON RAFAEL |
| Birth Date : | 2005 ▮▮▮▮ |
| Document Number : | 244376255 |
| Country of Citizenship : | Venezuela |

[ Get Travel History ]

▶ Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).

▶ If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.

▶ Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.

OMB No. 1651-0111
Expiration Date: 01/31/2024

For inquiries or questions regarding your I-94, please click here

Accessibility | Privacy Policy

Privacy - Terms

Exhibit 6

# PAROLED (DT) – PORT OF ENTRY GUIDANCE

UPDATED: FEBRUARY 2020



# PAROLED (DT) DISPOSITION GUIDANCE



FOR OFFICIAL USE ONLY



## INITIAL INFORMATION ON PAROLED (DT) – PORT OF ENTRY

An alien can be considered for parole if he or she is inadmissible or removable from the United States. The "DT" and "DE" codes were created to justify the reason for parole in specific cases.

To ensure that reasons for a port parole are consistent across OFO, users are now prompted to select a reason from the available dropdown menu and annotate an approving supervisor.

*Note: As a reminder, the parole of an alien into the United States must be documented on a Form I-94 and include the parole stamp.*

## PAROLED (DT) DISPOSITION GUIDANCE

FOR OFFICIAL USE ONLY



(b) (7)(E)

### SELECTING A REASON

(b) (7)(E)

# PAROLED (DT) DISPOSITION GUIDANCE

FOR OFFICIAL USE ONLY



(b) (7)(E)

## INFORMATION ICON (TOOL TIP)

(b) (7)(E)

Exhibit 7

official website of the United States government
Here's how you know

 **EOIR**   Automated Case Information

---

**Court Closures Today** April 16, 2024

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

Home > CONTRERAS HERNANDEZ, ANDERSON RAFAEL (244-376-255)



# Automated Case Information

### Name: CONTRERAS HERNANDEZ, ANDERSON RAFAEL | A-Number: 244-376-255 | Docket Date: 2/7/2024

## Next Hearing Information

Your upcoming **MASTER** hearing is **IN PERSON** on **August 15, 2025 at 9:00 AM**

**JUDGE**
Segal, Alice

**COURT ADDRESS**
26 FEDERAL PLZ, 12TH FL RM1237
NEW YORK, NY 10278

## Decision and Motion Information



*This case is pending.*

## Case Appeal Information

No appeal was received for this case.

## Court Contact Information

If you require further information regarding your case, or wish to file additional documents, please contact the immigration court.

**COURT ADDRESS**
26 FEDERAL PLZ 12TH FL RM 1237
NEW YORK, NY 10278

**PHONE NUMBER**
(212) 264-5958

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

ANDERSON CONTRERAS HERNANDEZ,

               Petitioner-Plaintiff,

               v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security; ROSE BROPHY, in her official capacity as Director of Field Operations, Buffalo Field Office, U.S. Customs and Border Protection; MARTIN COOMBS, in his official capacity as Patrol Agent in Charge, Buffalo Station, U.S. Border Patrol; STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement.

               Respondents-Defendants.

**Civil Action No.:**

**Declaration of Attorney Catharine Grainge**

---

**SWORN DECLARATION OF ATTORNEY CATHARINE GRAINGE**

I, Catharine Grainge, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. My name is Catharine Grainge. I am a part-time Immigration Staff Attorney for Prisoners' Legal Services of New York ("PLSNY"), based in Buffalo, New York. I have worked in this part-time capacity since October 2024. As part of the New York Immigrant Family Unity Project ("NYIFUP"), PLSNY provides legal representation to incarcerated individuals within the New York State prison system who are facing immigration proceedings, as well as detained noncitizens.

2. I am the attorney for Anderson Contreras Hernandez ("Anderson") and I represent him on a *pro bono* basis.

3. Anderson is currently admitted to Oishei Children's Hospital ("Oishei") in Buffalo, NY for treatment for his Sickle Cell Disease. I have made several attempts to meet with my client, Anderson while he has been hospitalized. When I have attempted to visit my client, there has been at least one guard seated outside of his hospital room.

4. I believe that the rotating guards posted outside of his room are from Customs and Border Protection ("CBP"). On June 7, 2025, I noticed that the first officer I encountered there (around 12pm) was wearing a grey uniform. When I introduced myself to him, I asked if he was with "CBP" or "ICE" and was told "CBP."

5. On June 7, 2025, I arrived at Oishei around 4pm for a legal visit with Anderson. Upon arriving at Anderson's hospital room, I introduced myself to the office outside the hospital room as Anderson's attorney and informed him that I was there for a legal visit.

6. While I was meeting with Anderson, his mother came into the room. At that point, the officer told Anderson's mother her she was not allowed in the room.

7. Sometime after Anderson's mother was told to leave, I heard what sounded like a heated or excited phone call between the officer and someone else. I could not make out any of the words that were said, from where I was in Anderson's hospital room.

8. When it sounded like the phone call had ended, that is when the officer came back into the room to talk to me. We stepped into the hall and the officer notified me that I was not permitted to meet with Anderson. I asked the officer for clarification and what law provided for this prohibition. I said, "under what authority am I not allowed to visit my client" and the officer replied "mine." I asked the guard if he could check with his supervisor. The officer told me his supervisor would "back" everything he was telling me. At that time, I gathered my belongings and left Anderson's room.

9. On June 9, 2025, around 7pm, I went back to Oishei Children's Hospital. Upon approaching Anderson's room I introduced myself to the CBP officer outside of his door and notified him I was there to have a legal visit with my client. This officer permitted me to enter my client's room and meet with him. I did not have access issues at that time.

10. On June 12, 2025, around 8am, I returned to Oishei Children's Hospital to visit Anderson. When I introduced myself to the officer outside Anderson's hospital room as the attorney for Anderson and said I was there for a legal visit. The officer told me his name was Dan and that he would need to check with his supervisor as to whether I was allowed to visit because he had been told "no visitors."

11. I asked Officer Dan if he would be reaching out to Officer Adam Matuszewski. Officer Dan explained that it would be either Officer Matuszewski or another supervisor at the same level as Officer Matuszewski. After some time, Officer Dan told me that his supervisor was now checking with the supervisor above him, Martin Coombs, who I now understand to be Patrol Agent in Charge ("PAC") of the Buffalo Station of the U.S. Border Patrol. I waited for a response for approximately thirty minutes. Eventually, I was given the office number and extension for PAC Martin Coombs.

12. When I called the number, I once again introduced myself as the attorney for Anderson and stated that I wanted to enter his hospital room for a legal visit. PAC Coombs told me that I would not be permitted to visit my client, pursuant to CBP policy. I stated that this seemed like a violation of my client's constitutional right to access his attorney. PAC Coombs promptly requested my callback number and said he would call me back in a few minutes.

13. PAC Coombs called me back a few minutes later and confirmed that I would not be permitted to meet with my client. When I asked for the name of the person making this decision he said I could take down his name, "Martin Coombs."

14. On June 13, 2025, around 3pm, I called the 11th floor of Oishei Children's Hospital. I identified myself as Anderson's attorney and requested to speak to Anderson about his legal case. I was transferred to his social worker, Emily. Emily informed me that due to unclear and inconsistent regulations from CBP about whether Anderson could speak with anyone, including his attorney, that she did not feel comfortable providing Anderson with a phone to speak with me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

06/17/25
Date

Catharine Grainge